IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF VIRGINIA
(Roanoke Division)

_____
                                    )
In re                               )
                                    )
BAYVIEW HOLDINGS, LLC,              )        Case No. 09-72799
                                    )
        Debtor.                     )
                                    )
_____)

## THIRD AMENDED DISCLOSURE STATEMENT

Bayview Holdings, LLC ("Debtor" or "Bayview Holdings"), has prepared and filed this Third Amended Disclosure Statement ("Disclosure Statement") for the purpose of providing creditors herein with adequate information about the Debtor and its proposed First Amended Plan of Reorganization (the "Plan"), which has been filed with the United States Bankruptcy Court for the Western District of Virginia (the "Bankruptcy Court"), so that creditors may make an informed judgment with respect to the Plan and its approval. A copy of the Plan accompanies this Disclosure Statement.

As a creditor, your acceptance of the Plan is important. In order for the Plan to be accepted, of those creditors voting, creditors holding at least two thirds in dollar amount and more than one half in number of the allowed claims of each class of creditors impaired under the Plan must vote to accept the Plan.

**NO REPRESENTATIONS CONCERNING THE DEBTOR, THE PLAN, OR THE VALUE OF THE DEBTOR'S PROPERTY, ARE AUTHORIZED BY THE DEBTOR UNLESS SET FORTH IN THIS DISCLOSURE STATEMENT. ACCORDINGLY, NO REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE, OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD BE RELIED UPON IN EXERCISING YOUR RIGHT TO ACCEPT OR REJECT THE PLAN.**

The information contained herein has not been subjected to a certified audit. Therefore, the Debtor is unable to warrant or represent that this information is without inaccuracy, although great effort has been made to be accurate.

**Bruce E. Arkema (VSB No. 18625)**
**Kevin J. Funk (VSB No. 65465)**
**DurretteCrump PLC**
**Bank of America Center**
**1111 E. Main Street, 16th Floor**
**Richmond, Virginia 23219**
**Counsel for Bayview Holdings, LLC**

## I.  INTRODUCTION

The Debtor is in the business of developing lots for residential construction. It owns lots on or near Smith Mountain Lake that it develops for sale to the general public, builders or on which it contracts for the construction of residences.

## II.  DEFINITIONS

Unless otherwise indicated, by context or otherwise, capitalized terms appearing in this Disclosure Statement shall have the meanings ascribed to them under Article I (Definitions), of the Plan.  *See* **Exhibit "A"** attached hereto.

## III.  BACKGROUND OF THE DEBTOR AND ITS CHAPTER 11 CASE

A.      Ownership and Origin

 Bayview Holdings was formed on March 20, 2002.  The Debtor is a limited liability company with corporate offices at its sole member's residence located at 280 Cool Spring Lane, Moneta, Virginia  24121.  The Debtor is owned by Tom Lovegrove, who is the sole member and managing member of Bayview Holdings.

B.      Business of the Debtor

Bayview Holdings is in the business of acquiring and developing land on or near Smith Mountain Lake in Virginia.

 On the date on which the petition was filed in this case, Bayview Holdings owned three (3) separate developments that it was developing and selling:

1.      The Villages at Emerald Bay

The Villages at Emerald Bay had approximately 29 lots for sale and had amenities either completed or in the late stage of completion.

Branch Banking & Trust Company ("BB&T") held a first lien on The Villages at Emerald Bay to secure a Deed of Trust Note in the amount of approximately $7.2 million.

After the petition was filed, BB&T filed a Motion for Relief from Stay with the Bankruptcy Court, seeking the right to foreclose on the property.  The Bankruptcy Court eventually granted that relief, and BB&T sold the property at foreclosure on or about March 24, 2010. The Debtor made several proposals to BB&T aimed at working out an agreement that would allow the Debtor to market and sell the lots. The Debtor believed these proposals were in the best interest of its creditors and BB&T; however, BB&T rejected them. BB&T or its affiliate was the successful bidder at the foreclosure sale and paid approximately $3.8 million for the development. BB&T has filed a Proof of Claim as an unsecured creditor in the amount of

2

$ 3,963,834.78 which will be included in Class 3 of the Plan.

2.     <u>Emerald Bay Estates</u>

Emerald Bay Estates was a 12-lot project on Smith Mountain Lake. The Debtor was the developer and built docks and other improvements. The development was very successful and sold ninety percent (90%) of the lots in less than 24 months.  The sales of the lots generated enough proceeds to satisfy a multi-million-dollar loan with Bank of Floyd. This success resulted in the Debtor's obtaining a new agreement with Bank of Floyd, wherein the Bank agreed to loan the Debtor Four Million Dollars ($4,000,000.00) for the purchase and development of Baywatch Estates. As additional security, the Bank of Floyd required the Debtor to pledge Lot 10, which the Debtor owned in Emerald Bay Estates.

The Note that Bank of Floyd holds has matured and is now due in full; however, the Bank of Floyd has agreed to renew the Note under the terms and conditions set forth below under Class 1.

The remaining  two lots, once known as the Equestrian Center and which border Strawberry Banks and Scruggs Road, were pledged by the Debtor as security for BB&T loan and were part of the foreclosure sale conducted by BB&T on March 24, 2010.

3.     <u>Baywatch Estates</u>

Bayview continues to own Baywatch Estates, which is located on Betty's Creek Cove on Smith Mountain Lake in Franklin County, Virginia.  The development adjoins State Route 949, also known as Lakewood Forest Road, approximately 2.4 miles from Scruggs Road. The development was originally comprised of 20 single-family residential lots; however, on the date the petition was filed, there were fourteen (14) lots remaining to be sold.  The website for the development can be found at http://www.baywatchestates.com.

The Bank of Floyd holds a first lien on the lots in Baywatch Estates as well as Lot 10 in Emerald Bay Estates. It was owed approximately $2,571,287.35 on the date the petition was filed.  As a result of accrued interest offset by the sale of a lot, the balance as of December 3, 2010 was $2,627,941.05 based upon the bank's calculations. The Note that Bank of Floyd holds has matured and is now due in full; however, the Bank of Floyd has agreed to renew the Note under the terms and conditions set forth below under Class 1.

Mr. Lovegrove, the managing member of Bayview Holdings, has been in the construction and development business since 2002.  He also is President of Bayview Construction, Inc., which has constructed residential homes in Franklin and Bedford Counties since 2002.

The Plan of Development for the Property has been approved by the County of Franklin, and it has been duly recorded.  Development bonds and sums required by applicable ordinances have been posted.

The development of residential real estate lots in general came to a sudden stop in 2007, with the national mortgage crisis and the subsequent recession that swept the nation.  Smith Mountain Lake was hit especially hard by this sudden stop in the demand for recreational and second-home residential building lots.  Mr. Lovegrove's construction business also was hit hard by the sudden lack of demand for building homes on Smith Mountain Lake.  That caused the payments to Branch Banking & Trust to become in arrears.  Branch Banking & Trust then commenced foreclosure proceedings, which precipitated the Chapter 11 filing.

Fortunately, Bayview Holdings had established a secured interest reserve account at Bank of Floyd that covered the interest as it accrued on that loan.  Since the petition was filed, Bayview Holdings has sold approximately two (2) lots in the ordinary course of business, which has enabled it make some payments towards the amounts owed to the Bank of Floyd.

Bayview Holdings believes that the market for the lots in Baywatch will eventually return and that Bayview Holdings will be able to sell the lots, either to other builders or to end users.  It believes that it has about $797,059.00 in equity in the lots, based on the expected selling price in 2010, and will, therefore, liquidate the lots by selling them to third parties or building homes for sale on the lots.  In short, Bayview Holdings intends to liquidate all of its holdings and use the proceeds to fund the Plan.

C.      Post-Filing Proceedings in the Bankruptcy Case

Relief From Stay Order

As stated above, after the petition was filed, BB&T filed a Motion for Relief from Stay, seeking the right to foreclose on its collateral, which consisted of the lots in the Villages at Emerald Bay and the remaining  two lots in Emerald Bay Estates once known as the Equestrian Center.  Bayview Holdings contested the Motion and asked the Bankruptcy Court to deny the Motion.  BB&T contended that the value of its collateral was approximately $3.8 million and that it was owed approximately $7,200,000.00.  The  Debtor had no ability to contest the appraisal that BB&T procured to support its claim as to value.  On January 9, 2010, the Bankruptcy Court entered an order that directed Bayview Holdings to make an adequate-protection payment of $48,804.90 on or before January 29, 2010.  Bayview Holdings did everything it could possibly think of to either raise the money or provide BB&T with an alternative to foreclosure.  Nothing materialized or was agreed to, and the foreclosure sale was held on March 24, 2010. BB&T or its affiliate was the successful bidder at the foreclosure sale and paid approximately $3.8 million for the development. While the Debtor has not received a formal accounting from BB&T, BB&T has filed a proof of claim in this case claiming it is owed $3,963,843.78.

4

## IV.  REMAINING ASSETS AND LIABILITIES

A.    <u>Assets</u>

The Debtor's Assets are as follows:

| Asset | Debtor's Estimate of Value | Lien | Equity |
|---|---|---|---|
| 1.   Baywatch Estates | $3,425,000.00 | $2,627,941.00 | $797,059.00 |
| 2.   Account at Bank of Floyd | $0.00 | $0.00 | $0.00 |
| 3.   2004 Ford 350 | $100.00 | $0.00 | $100.00 |
| 4.   Office Furnishings | $1,000.00 | $0.00 | $1,000.00 |
| **TOTAL:** | | | **$798,159.00** |

The value of the lots in Baywatch Estates is not liquid, and the Debtor estimates that it may take up to five (5) years to liquidate the lots in order to realize the equity.  The value of the lots is based on the market for residential lots on Smith Mountain Lake rebounding.  The Debtor believes that the value of the lots can only be realized by holding the lots until the market rebounds.

B.    <u>Creditors' Claims as of September 14, 2010</u>

The Bankruptcy Court has set September 14, 2010 as the last date on which persons or entities can file proofs of claim against the Debtor in this case.  In some cases, the amounts set forth in individual proofs of claim may differ from the amounts set forth for those claims on the Debtor's schedules. Where the Debtor determines that the amount stated in a proof of claim is correct, it will not object, and in the absence of other objections, the claim will be allowed at that stated amount.  Where the Debtor contests the amount set forth in a proof of claim, it will file an objection, give the creditor notice of the objection and the creditor will have an opportunity to respond and present evidence to the Court if the creditor so desires.

The Plan provides that the Debtor will review all claims filed or deemed filed, and all objections to the allowance of claims will be filed within 60 days after confirmation of the Plan. The Plan also provides that every claim against the Debtor that arose prior to Confirmation will be discharged upon Confirmation.

As of November 19, 2010, certain creditors had filed proofs of claim in the case or were listed by the Debtor as undisputed obligations. Based upon a review of the proofs of claim, the Debtor believes that the following accurately describes the claims against it:

1.    <u>Administrative Claims</u>:  Allowed Administrative Claims consist of, *inter alia*, Claims that are allowed pursuant to 11 U.S.C. § 503(b) and entitled to priority under 11 U.S.C. § 507(a)(1). Pursuant to the Plan, each holder of an Allowed Administrative Claim shall be paid either (i) in full, in cash, on the Effective Date or as soon as practicable thereafter, or (ii) upon such other terms as may be agreed upon by Bayview Holdings and the holder of such Allowed Claim.  Any fees then due and owing to the United States

Trustee under 28 U.S.C. § 1930 shall be paid in full on the later of the Effective Date or the date by which such fees are due.

Such Claims include Claims of professional persons for Professional Fees for actual and necessary services rendered for the benefit of the Bankruptcy Estate. Notwithstanding anything contained in the foregoing, an allowed Professional Fee Claim for services rendered during the Chapter 11 Case shall be paid in full within ten (10) days after entry of an order allowing such compensation and reimbursement, or upon such other terms as may be agreed to by the holder of such Professional Fee Claim and the Debtor. The Debtor is aware that Franklin County has filed a priority claim in the amount of $4,080.64 related to personal property taxes that accrued in 2009.

2.    Unsecured Claims without priority in the total amount of $4,282,507.50 based on Proofs of Claims filed on or before the bar date established by the Bankruptcy Court.

3.    Secured Claims:

    A.    The Bank of Floyd has a first-priority security interest in the Interest Reserve Bank Account that the Debtor established at the bank to pay interest that accrues on the loan. In addition, Bank of Floyd has a first-priority lien on the lots and other improvements in Baywatch Estates. Based on the bank's records the balance owed is $2,6257,941.05. The interest that accrues on the Bank of Floyd's Secured Claim is approximately $13,000.00 per month; and

    B.    As of the petition date the County of Franklin was owed approximately $155,000.00 related to real estate taxes owed to it on both The Villages at Emerald Bay and Baywatch Estates. Based an amended proof of claim the county's secured claim is $71,943.67.

C.    Executory Contracts and Unexpired Leases

The Debtor is not, to its knowledge, a party to executory contracts or unexpired leases as of the Petition Date. There is an executory contract to sell one of the lots as of the date that this Disclosure Statement was filed.

D.    Unpaid Debt Incurred since the Commencement of the Case

The Debtor has not incurred any debt post-petition except attorney fees, insurance and taxes. Mr. Lovegrove has paid the insurance premiums that relate to the Debtor's projects.

E.      <u>Distribution on Unsecured Claims</u>

No distributions with respect to Unsecured Claims have been made post-petition.

F.      <u>Liquidation Analysis</u>

In order to make an informed decision on whether to accept or reject the Plan, unsecured creditors may compare the return on their prepetition claims under the Plan to the probable return if this case were to be converted to a case under Chapter 7 of the Bankruptcy Code.  Under Chapter 7, a disinterested Chapter 7 trustee is appointed by the Bankruptcy Court to liquidate a debtor's assets and to distribute those assets in accordance with priorities established by the Bankruptcy Code. Under the Bankruptcy Code, payments of administrative claims (including the trustee's fee, trustee's counsel's fee, costs of maintaining and liquidating the assets of the estate and taxes) are entitled to first priority.  Secured creditors receive either the property on which they have a lien or the proceeds from the sale of that property. Unsecured creditors are entitled to payment only after payment of administrative expenses, and any payments to secured creditors.

If this case were to be converted to a case under Chapter 7, a Chapter 7 trustee would be appointed to administer the case, and the Chapter 7 trustee, in all likelihood, would appoint an attorney to represent him or her in the case. The Chapter 7 trustee would be entitled to a commission based on the total amount of funds in the estate. In contrast, under the Plan, there is no trustee's commission to be paid in this Chapter 11 case. In addition, the Chapter 7 trustee's attorney would be required to become familiar with the case. This presupposes that a Chapter 7 estate would have any assets available to fund either administrative expenses or distributions to unsecured creditors after the satisfaction of secured creditors. The Debtor believes that if the Property were to be auctioned or sold in the current market, the proceeds would not be sufficient to pay off the lien held by the Bank of Floyd. This belief is based on the fact that in 2008, the lots in the Villages at Emerald Bay were worth approximately $6,000,000.00, and in the Fall of 2009, the same lots were purchased at foreclosure for approximately $3,800,000. There have been additional forced sales in the area of Smith Mountain Lake that have brought as little as fifty percent (50%) of appraised values.  If these values were applied to the lots in Baywatch Estates, then they would be worth approximately One Million, Four Hundred Six Thousand Dollars ($1,406,000.00), which is less than what is owed to Bank of Floyd. Therefore, it is believed that there would be no excess assets available in a Chapter 7 liquidation.  Accordingly, the Debtor believes that creditors will receive larger payments under the Plan than they would receive if the case were to be converted to a Chapter 7 case.  The Debtor thus believes the Plan should be confirmed in the interest of resolving this case expeditiously and maximizing the return to unsecured creditors.

G.    Plan Feasibility

The Court cannot confirm a Plan if it is not feasible.  A Plan is feasible if the Plan proponent can perform its obligations under the Plan and if confirmation will not likely be followed by either the liquidation or the need for further financial reorganization of the Debtor. The Debtor has been able to sell a few lots post-petition. The Debtor believes that it will be able to sell lots at a slower pace for the next 12 to 24 months, that the real estate market will have "turned around" in the coming 36 months and that it will be able to sell the Property for more than the amount owed on it within 60 months from the Effective Date.  Since the Debtor is, in essence, seeking to liquidate its assets, there will not be a subsequent need to do so if the Plan is unsuccessful. Thus, the Debtor believes it has the ability to meet its obligations under the Plan and has concluded that it will meet its obligations and that confirmation will likely not be followed by the liquidation or further financial reorganization of the Debtor.

H.    Marketing of Baywatch Estates During Plan Period

The Debtor will market the Property in the following manner:  The debtor is currently advertising two lots (8 and 11) with Mary Lou McDonald, a licensed real estate broker employed as an associate broker with Realty World Properties located at 1037 Whitetail Drive, Huddleston Virginia   24104.  Ms. McDonald specializes in the sale of property at Smith Mountain Lake. Her website is http://www.maryloumcdonald.net.  The lots will be advertised by posting signs on the property, print advertising, newspaper advertising, use of electronic mail advertisements sent to a data base of 6,000[+], and web marketing (see for example: http://www.smith-mountain-lake-visitor-center.com/real_estate_listings_intro.htm).  The debtor intends to limit the listings to two lots at any time so as not to "flood the market" with lots, thereby reducing the prices.  The debtor anticipates that Ms. McDonald will continue to serve as the realtor for all remaining lots when those are listed.  A good-faith estimate of the expenses associated with the liquidation of the Debtor's assets is attached hereto as Exhibit B.  The listing agreements for lots 8 and 11 and the respective MLS listings are attached hereto as Exhibit C.

The Bank of Floyd has agreed to certain terms set forth below for the Class 1 Creditor. That agreement, in summary form, is that the Debtor is required to sell at least two lots during each 12-month period in order for the Bank of Floyd to forebear from calling its Note and foreclosing on the lots it has as collateral.  The Debtor believes that it can perform under that agreement.

However, as a backstop, if any of the lots are not sold within 60 months from the Effective Date and Bank of Floyd is still owed sums under the Note, then the Bank of Floyd and the Debtor will attempt in good faith to agree on a public auction or some other reasonable procedure to liquidate the remaining lots by the end of the 61st month after the Effective Date.  If the Bank of Floyd and the Debtor cannot agree on such a liquidation, Bank of Floyd will be granted relief from the automatic stay to pursue its nonbankruptcy remedies, including foreclosure on such lots.  If the Bank of Floyd is not owed any sums under the Note, the Debtor will conduct such an auction.

I.        Payments and Compensation for Management of Debtor Post-Confirmation

The success of selling lots and marketing the Property of the Debtor depends upon the support and cooperation of  Mr. Tom Lovegrove, who has the ability to provide construction services and other services that most retail buyers of lots require. Mr. Lovegrove will continue to manage and be in charge of the day-to-day operations of the Debtor until the Plan and liquidation is completed. Day-to-day management includes such functions as making sure the lots and other common areas are kept in a marketable condition, managing listings and negotiating contracts, and steering potential buyers to contractors to give estimates on construction costs. Mr. Lovegrove will not receive anything for his ownership interest in the Debtor, and he will not receive any compensation as the Disbursing Agent. The Debtor believes that if Mr. Lovegrove is not compensated for his services, he will resign and the Plan will not be successfully completed. Therefore, the Debtor believes that he should receive compensation post-confirmation. The Debtor believes that Mr. Lovegrove's compensation should be tied to the success of the Debtor's Plan of Liquidation and that the more that he can realize for the Class 3 Unsecured Creditors the more he has generated value for the creditors and the estate.

The Debtor will pay Mr. Lovegrove thirty-five percent (35%) of the net amount that is distributed to Class 3 creditors under the Plan. That distribution, if all of the Debtor's estimates are correct, will amount to $9,206.51 if the lots are sold for nothing more than the release fee and $248,956.51 if the lots are sold for 25% above the Release Fee.

Mr. Lovegrove would receive this compensation when distribution under the Plan is made to the Class 3 Creditors.

## V.  SUMMARY OF THE PLAN

The following is a brief summary of the Plan and should not be relied upon for voting purposes. Creditors are urged to read the entire Plan and to consult with counsel or each other in order to fully understand the Plan.  If confirmed, the Plan would represent a legally binding agreement by the Debtor with each of its creditors, and an informed decision concerning the approval of the Plan cannot be made without understanding it.  It is important to note that the plan and consequent distribution to creditors is dependent on the sale of lots and thus, the real estate market over the next five years.  Because the real estate market is beyond the control of the debtor it is impossible for the debtor to predict exactly how much money will be available for each class.  The amount of funds going to unsecured creditors in the event the remaining assets are sold for the minimum amount provided for in the Plan (Bank of Floyd's Release Fee) is attached hereto as Exhibit D.  The debtor expects that the amount received for lots will exceed this minimum.  This expectation is based, in part, on the fact that it has already executed a contract to sell Lot 12 at 25% above the Release Fee.  Accordingly, an accompanying analysis showing distributions if all lots are sold at 25% above the Release Fee is included on Exhibit D.

Administrative Expense Claims and the Priority Claims will be paid by the Debtor under the Plan on either the Effective Date or the date when payment of such claims become due in accordance with terms or as the holder of those claims and the Debtor may agree upon.  The

debtor anticipates $5,000 in post-confirmation administrative fees.  This amount is in addition to $8,811.00 which remains unpaid to debtor's counsel from its approved fee applications.

**Class 1:**  Class 1 consists of the Secured Claims of the Bank of Floyd under the Bank of Floyd Loan Documents, which shall hereby constitute Allowed Secured Claims pursuant to this Plan.  Bank of Floyd's records indicate that the amount of the Bank's claim as of December 3, 2010 was $2,627,941.05 (the "Loan").  The monthly interest accruing on that amount is approximately $13,000.00.  The Note due to Bank of Floyd has matured and is now due and payable in full.

The claims of Bank of Floyd are impaired.

In full, complete and final satisfaction of its Claims, the Bank of Floyd shall receive the following treatment herein:

The Bank of Floyd will renew the obligations owed by the Debtor for one (1), twelve-(12) month period, commencing on the Effective Date, subject to the following terms and conditions:

A.   The release fees for each of the Lots subject to the Bank of Floyd's Deed of Trust lien are as follows (the "Release Fee"):

| | |
|---|---|
| Lot 1, Baywatch | $100,000.00 |
| Lot 2, Baywatch | $125,000.00 |
| Lot 3, Baywatch | $200,000.00 |
| Lot 8, Baywatch | $200,000.00 |
| Lot 9, Baywatch | $125,000.00 |
| Lot 10, Baywatch | $190,000.00 |
| Lot 11, Baywatch | $200,000.00 |
| Lot 12, Baywatch | $200,000.00 |
| Lot 15, Baywatch | $200,000.00 |
| Lot 16, Baywatch | $150,000.00 |
| Lot 17, Baywatch | $250,000.00 |
| Lot 18, Baywatch | $500,000.00 |
| Lot 22, Baywatch | $  50,000.00 |
| Lot 10, Emerald Bay Estates | $250,000.00 |

B.   The Release Fee from the sale of the first lot sold will be applied first to the payment of accrued and unpaid interest on the Loan, second to the payment of accrued and unpaid real estate taxes outstanding for all of the Lots, with the remaining balance being applied to the outstanding principal balance of the Loan.  Release Fees from subsequent sales of the Lots will be applied solely to the outstanding principal balance of the Loan.  It is important to

10

note that the total amount of the Release Fees exceed the balance of the Loan.  Thus, it is anticipated that Bank of Floyd will be paid in full before all of the lots are sold.  Furthermore, the debtor has executed a contract for Lot 12 with a sale price of 25% above the release fee.

C.      All proceeds from the sale of Lots in excess of the Release Fees will be deposited into the Reserve Account, from which the Bank of Floyd will be authorized to withdraw funds necessary to pay monthly interest as it accrues on the Loan's outstanding balance.

D.      Beginning with the sale of the first lot sold, Debtor agrees to keep current interest payments on the outstanding balance due under the Loan, as well as all real estate taxes assessed against the real estate subject to the Bank of Floyd's lien.

E.      Two (2) Lots must be sold during the twelve (12)-month period immediately following the Effective Date.

F.      To the extent the net proceeds of sale of any Lot exceeds the Release Fee, and further provided interest on the Loan and all real estate taxes associated with the property subject to the Bank of Floyd's lien are current, the Debtor may retain an amount equal to four percent (4.0%) of the amount by which the net proceeds of any such sale exceed the sum of the Release Fee, interest due and accrued real estate taxes.

G.      Provided all of the foregoing terms and conditions are fulfilled by the Debtor during the initial twelve (12)-month period, or any additional twelve (12)-month period granted by the Bank of Floyd, the Bank of Floyd will, in its reasonable discretion, consider renewal of the Loan for an additional twelve (12)-month period on the same terms and conditions.

H.      If the Debtor fails to honor the foregoing terms and conditions during the initial twelve (12)-month period or any subsequent renewal twelve (12)-month period, no further renewals will be granted, the automatic stay will be lifted and the Bank will be free to exercise its rights under the Bank of Floyd Loan Documents with respect to the collateral described therein.

If any of the lots are not sold within 60 months from the Effective Date and Bank of Floyd is still owed sums under the Note, then the Bank of Floyd and the Debtor will attempt in good faith to agree on a public auction or some other reasonable procedure to liquidate the remaining lots by the end of the 61st month after the Effective Date.  If the Bank of Floyd and the Debtor cannot agree on such a liquidation, Bank of Floyd will be granted relief from the automatic stay to pursue its nonbankruptcy remedies, including foreclosure on such lots.  If the Bank of Floyd is not owed any sums under the Note, the Debtor will conduct such an auction.

**Class 2:**  Consists of the Secured Claims of the County of Franklin, Virginia.  As of the Petition Date, Franklin County was owed approximately $152,000.00.  Based upon the amended proof of claim filed November 29, 2010, Franklin County's secured claim is $71,943.67.  The substantial reduction is the result of the foreclosure sale of the Villages at Emerald Bay.  All amounts due on each lot or parcel of real estate owned by the Debtor will be paid as and when the lots or parcels sell.  The payment will include all interest and accrued charges that are applicable under law.  The County will remain fully secured for all taxes owed on land owned by the Debtor. To the extent any of the amounts listed on the County of Franklin's Proof of Claim as secured relate to the land that was foreclosed upon by BB&T, those amounts either will be deducted from the County's secured proof of claim and become unsecured claims or will be eliminated if they have been paid.

The Claims of Franklin County are impaired.

**Class 3:**  Consists of the Unsecured Creditors of Bayview Holdings. Unsecured creditors will receive a *pro rata* distribution based on each unsecured creditor's claim compared to the total amount of all allowed unsecured creditors' claims.

The Class 3 claims are impaired.

The total amount that will be distributed to all unsecured creditors is uncertain at this time. The gross amount will be established when all of the lots in Baywatch Estates are sold. The lots will be placed on the market and actively marketed to be sold.  It is expected that the lots will be sold within 60 months of the Effective Date.

As lots are sold, if those sales produce any money that the Debtor is permitted to retain (herein referred to as "Earnings") under the agreement that it has with the Class 1 Creditor, then the Earnings will be placed in the Debtor's Distribution Account. From those Earnings the Debtor will pay its administrative and priority claims, post-petition operating expenses, including wages and salaries to its principal, Tom Lovegrove, disclosed in Section IV(I) of the Disclosure Statement, and the remainder will be distributed to the Unsecured Creditors on a *pro rata* basis (based on their allowed claim in relation to all allowed secured claims) on each anniversary of the Effective Date until all the assets of the Debtor have been liquidated.

**Class 4:**  Consists of the equity interests in the Debtor held by the sole member, Tom Lovegrove.  Mr. Lovegrove's interest in the Debtor shall be cancelled, and because this is a liquidation Plan, he will not retain any ownership interest after the Plan is completed.

# VI.  DISTRIBUTIONS

A.      Disbursing Agent

        The Plan provides for the appointment of a Disbursing Agent to manage and make
distributions from a Distribution Fund in accordance with the terms of the Plan.  The Plan
provides that Tom Lovegrove shall serve as the Disbursing Agent under the Plan.  The
Disbursing Agent's functions shall be limited to the duties set forth by the Plan.  The Disbursing
Agent shall not be entitled to compensation for his services but will be entitled to reimbursement
of all reasonable and necessary expenses.

B.      Distribution Fund

        On the Effective Date, a Distribution Fund shall be created. All funds that the Debtor is
entitled to receive from the sale of the Lots will be deposited in the Distribution Fund.  All funds
in the Distribution Fund shall be used for the payment of any Allowed Administrative Expense
Claims, including Professional Fee Claims, Allowed Priority Claims or Allowed Unsecured
Claims and the payment of compensation to the management of the Debtor as disclosed in IV(I)
above.  The funds in the Distribution Fund shall be paid only in accordance with the priorities
established under the Plan, and no payment shall be made to the holder of a Claim in a junior
class until the holders of all Allowed Claims in senior classes and Administrative Expense
Claims, including Professional Fee Claims, have been paid in full in accordance with the Plan,
unless an appropriate Reserve has been established.  From time to time, the Disbursing Agent
shall establish the amount of the reserve of funds in the Distribution Fund sufficient to pay the
amount of any Disputed Claims.

C.      Distributions to Unsecured Creditors

        At least annually after the Effective Date, all funds in the Distribution Fund shall be
disbursed as follows: (1) the payment of  sums due to management of the Debtor under IV(I)
above; (2) the payment of Administrative Expense Claims, including Professional Fee Claims;
and (3) after the foregoing, the remainder, if any, shall be used by the Disbursing Agent for *pro
rata* distributions to the holders of Class 3 Allowed Claims.  Such distributions shall be made on
a date determined by the Disbursing Agent until the Court enters a Closing Order.  Any fees
payable under 28 U.S.C. § 1930 accruing after the Effective Date shall be treated as
Administrative Expenses.  An analysis showing the distributions to unsecured creditors if the lots
are sold for the Release Fee and if the lots are sold at 25% above the Release Fee (as is the case
with the pending contract for Lot 12) is attached hereto as Exhibit D.

D.      Reporting

        The Disbursing Agent shall file with the Court, at least annually after the Effective Date,
a report that includes a statement of cash receipts and disbursements, and information on the
progress of intended distributions and shall serve such report on Counsel for the Debtor, all
creditors and Office of the United States Trustee.

E.      Miscellaneous

The Disbursing Agent may stop payment on any distribution check that has not cleared the issuing bank within ninety (90) days of the date of distribution of such check.  No distribution under the sum of $10.00 is required to be made by the Disbursing Agent.  All unclaimed funds or property shall be subject to the provisions of 11 U.S.C. § 347(b).  All penalties, default interest or late fees that may have accrued on any claim, other than a secured claim, prior to the Confirmation Date are disallowed.

## VII.      EFFECT OF CONFIRMATION

Except as otherwise provided in 11 U.S.C. § 1141(d)(3), and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, Bayview Holdings and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.  After the Confirmation Date, the automatic stay of 11 U.S.C § 362(a) shall remain in full force and effect until entry of a Closing Order that becomes a Final Order.  Without limiting the foregoing, on and after the Confirmation Date and until the Closing Order becomes a Final Order, all Entities that have held, currently hold or may hold a Claim or other debt or Liability that is addressed in the Plan are permanently enjoined from taking any of the following actions on account of any such Claims, debts or Liabilities, other than actions brought to enforce any rights or obligations under the Plan: (i) commencing or continuing in any manner any action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against Bayview Holdings and its properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against Bayview Holdings and its properties; (iii) creating, perfecting or enforcing any lien or encumbrance against Bayview Holdings and its properties, or any direct or indirect transferee of any property of Bayview Holdings; and (iv) commencing or continuing, in any manner or any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

Upon the Confirmation Date, all property of the estate shall continue to be property of the estate.  All such property shall be free and clear of all Claims and Interests, except for the Allowed Secured Claims as provided in the Plan.  The granting of security interests, mortgages, deeds, deeds or trusts, or any other instrument of transfer pursuant to this Plan, shall be exempt from the imposition of stamp taxes, transfer taxes or similar taxes pursuant to 11 U.S.C. § 1146(c).

## IX.     PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

A.     General

Article VIII of the Plan proposes a mechanism for the resolution and treatment of Disputed Claims.  Under that mechanism, Bayview Holdings may file with the Bankruptcy Court, within the later of one hundred twenty (120) days after the Effective Date or thirty (30) days after a particular proof of claim is filed, or such other date established by the Bankruptcy Court, an objection to the allowance of any Claim, or any other appropriate motion or adversary proceeding with respect thereto.  All such objections will be litigated to Final Order; provided, however, that Bayview Holdings may compromise and settle, withdraw or resolve by any other method approved by the Bankruptcy Court, any such objections to Claims.  In addition, Bayview Holdings may, at any time, request that the Bankruptcy Court estimate any Claim under 11 U.S.C. § 502(c), regardless of whether such Claim has been previously objected to or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount will be limited to the purposes (such as voting on the Plan) determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, Bayview Holdings may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned Claim objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.

B.     Distributions/Reserve for Disputed Claims

Notwithstanding any other provision of the Plan to the contrary, the Plan prohibits the making of any distribution to the holder of a Disputed Claim or the holder of a Claim that is the subject of a proceeding against it by Bayview Holdings unless and until such Disputed Claim becomes an Allowed Claim by Final Order.  While disputes regarding Claims are pending, the Disbursing Agent shall hold for the benefit of each holder of a Disputed Claim an amount equal to the distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim, or, if so determined by the Bankruptcy Court, such amount as estimated by the Bankruptcy Court under 11 U.S.C. § 502(c), until such Claim becomes an Allowed Claim.

As soon as practicable after a Disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim will receive all distributions to which such holder is then entitled under the Plan on account of such Allowed Claim.  Any Entity that holds both an Allowed Claim and a Disputed Claim will receive the appropriate distribution on the Allowed Claim, although no distribution will be made on the Disputed Claim until such dispute is resolved by settlement or Final Order.  After resolution of a dispute, any cash previously reserved for such Disputed Claim and not paid in connection with the resolution thereof shall be included in the Distribution Fund.

## IX.  SOLICITATION OF PLAN APPROVAL

**THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN DAYLIGHT TIME, ON _____ (THE "VOTING DEADLINE"), UNLESS EXTENDED BY THE DEBTOR WITH THE APPROVAL OF THE BANKRUPTCY COURT.  IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY DURRETTE BRADSHAW PLC (ATTENTION:  BRUCE E. ARKEMA), BANK OF AMERICA CENTER, 1111 EAST MAIN STREET, 16TH FLOOR, RICHMOND, VIRGINIA 23219 ON OR PRIOR TO THE VOTING DEADLINE.**

Upon the terms and subject to the conditions set forth in this Disclosure Statement and in the accompanying Ballot, the Debtor is soliciting acceptances of the Plan from claimants eligible to vote.  Your vote on whether to accept or reject the Plan is important.  Although this Disclosure Statement summarizes the Plan, you should read the Plan in its entirety.  To adopt the Plan, the Debtor must receive acceptances of the Plan from (1) claimants eligible to vote holding at least two-thirds (2/3) of the principal amount of each Class of Claims actually voting on the Plan, and (2) more than one-half (1/2) in number of the holders of such Claims that actually vote on the Plan (the "Requisite Acceptances").  Because only those holders who vote to accept or reject the Plan will be counted for purposes of determining acceptance or rejection of the Plan, the Plan could be approved by the affirmative vote of claimants eligible to vote holding significantly less than two-thirds (2/3) of the aggregate principal amount of each class of Claims entitled to vote on the Plan, and less than one-half (1/2) in number of the claimants eligible to vote with respect to each such Class.  Even if the Plan is accepted by the Classes entitled to vote, it will remain subject to review by and approval of the Bankruptcy Court.

**A COPY OF THE PLAN IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A AND IS INCORPORATED HEREIN BY REFERENCE.  THE FOLLOWING IS A SUMMARY OF THE MATERIAL PROVISIONS OF THE PLAN.  YOU SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY FOR A FULL UNDERSTANDING OF ITS TERMS.**

## X.  EXECUTORY CONTRACTS

Pursuant to the Plan, the entry of the Order of Confirmation automatically constitutes an order approving the rejection, as of the Effective Date, by Bayview Holdings of all executory contracts and unexpired leases of Bayview Holdings that existed at the time the Chapter 11 Case was filed, except for any executory contracts or leases (a) assumed by Bayview Holdings or assumed and assigned by Bayview Holdings to third parties on or before the Effective Date, or (b) which are the subject of a motion to assume or to assume and assign that has not been decided by the Bankruptcy Court as of the Effective Date.  The Plan also establishes a "Bar Date" for filing Claims arising from the rejection of executory contracts or unexpired leases.

Under the Plan, all such claims must be filed and served upon Bayview Holdings within the later of thirty (30) days after entry of a Final Order authorizing such rejection or the Bar Date.  Any such claim not filed within the required time period is disallowed. This Plan and the notice of the Confirmation Order shall constitute notice to parties who may assert a Claim for damages for the rejection of an executory contract or unexpired lease of the deadline for filing proofs of such Claims.

## XI.  MODIFICATION

Bayview Holdings reserves the right, in accordance with the Code, to amend or modify the Plan prior to the Confirmation Date.  Any such modifications of the Plan that are filed by Bayview Holdings with the Court will become the Plan.  Bayview Holdings also reserves the right to modify the Plan at any time after the Confirmation Date, regardless of whether the Plan has been substantially consummated within the meaning of Sections 1101(2) and 1127(b) of the Code, if circumstances warrant such modification, if all required disclosure under Section 1125 of the Code has been given, and the Court, after notice and a hearing, confirms the Plan as modified.  As more set forth in the Plan, Bayview Holdings, with the approval of the Court, also may correct non-material defects or omissions in the Plan.

## XII.  RETENTION OF JURISDICTION

The Plan provides for the retention of jurisdiction by the Bankruptcy Court after confirmation of the Plan for the following purposes:

(a)     to determine the allowance and classification of any Claim, the reexamination of Claims which have been allowed for purposes of voting, and the determination of any objections to Claims that may be or may have been filed;

(b)     to determine motions to estimate Claims at any time, regardless of whether the Claim to be estimated is the subject of a pending objection, a pending appeal, or otherwise;

(c)     to determine motions to subordinate Claims at any time and on any basis permitted by applicable law;

(d)     to construe or take any action to enforce the Plan, and to issue such Orders as may be necessary for the implementation, execution, and consummation of the Plan;

(e)     to determine any and all applications for allowance of compensation or reimbursement of expenses;

(f)     to determine any other requests for payment of Administrative Expenses;

(g)     to resolve any disputes arising under the Plan;

(h)     to modify the Plan pursuant to Section 1127 of the Code and applicable Bankruptcy Rules;

(i)     to take any action to correct any defect, cure any omission or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(j)     to enter any order, including injunctions, necessary to enforce the rights, title and powers of Bayview Holdings or the Disbursing Agent and to impose such limitations, restrictions, terms and conditions of such rights, title and powers as the Bankruptcy Court may deem necessary;

(k)     to enforce any Order previously entered by the Bankruptcy Court in this case and to enter the Closing Order;

(l)     to determine pending applications for the assumption or rejection of executory contracts or unexpired leases to which Bayview Holdings is a party or with respect to which Bayview Holdings may be liable, and to hear and determine, and if need be to adjudicate, any and all Claims arising therefrom;

(m)     to determine applications, adversary proceedings and contested or litigated matters and all Causes of Action, whether pending on the Effective Date or commenced thereafter;

(n)     to issue orders in aid of execution of the Plan to the extent authorized by 11 U.S.C. § 1142; and

(o)     to determine such other matters as may be set forth in the Confirmation Order.

## XIII.   ALTERNATIVES TO THE PLAN

The Plan implements Bayview Holdings' strategy after giving the Plan much thought. Bayview Holdings has determined that the Plan is the most practical means of providing for maximum recoveries to creditors.  During the course of the Chapter 11 case, Bayview Holdings has considered and evaluated a liquidation of its remaining assets under Chapter 7 of the Bankruptcy Code.  In Bayview Holdings' judgment, the Plan, by comparison, provides a greater and more expeditious recovery to creditors in a manner which minimizes certain risks inherent in any other course of action available to the Estate.

A.    <u>Alternative Chapter 11 Plan</u>

If the Plan is not confirmed, Bayview Holdings, or any other party in interest, may attempt to formulate an alternative Chapter 11 plan, which might provide for the liquidation and distribution of Bayview Holdings' assets other than as provided by the Plan.  However, because most of Bayview Holdings' Plan provides for the liquidation of the remaining assets by Bayview Holdings' present management, Bayview Holdings believes that any alternative Chapter 11 plan will necessarily be inferior to the Plan, because it would merely impose unnecessary delay in the Plan process and interrupt the liquidation of assets.  Any attempt to formulate an alternative Chapter 11 plan would unnecessarily delay creditors' receipt of distributions yet to be made and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to holders of Claims than are currently provided for in the Plan. Accordingly, Bayview Holdings believes that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims with the least delay.

B.    <u>Certain Risk Factors</u>

In the event the Plan is not confirmed or the Chapter 11 Case is converted to a case under Chapter 7 of the Bankruptcy Code, Bayview Holdings believes that its estate will incur substantial expenses and that such conversion will serve only to prolong unnecessarily the Chapter 11 Case and negatively affect creditors' recoveries on their Claims.

C.    <u>Ballots and Voting Deadline</u>

Each holder of an Allowed Claim entitled to vote on the Plan has been sent by mail a ballot, together with this Disclosure Statement.  The ballot is to be used for voting to accept or reject the Plan.

The Bankruptcy Court has directed that, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be mailed or delivered by hand or courier so that they are **ACTUALLY RECEIVED** by Bayview Holdings no later than 5:00 p.m. eastern standard time on _____, at the following address:

> DurretteBradshaw PLC
> Bank of America Center
> 1111 East Main Street, 16th Floor
> Richmond, Virginia  23219
> Attention Beth McMillen

**TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY 5:00 P.M. EASTERN STANDARD TIME ON _____. BALLOTS DELIVERED BY TELECOPIER WILL NOT BE COUNTED.**

D.      Parties in Interest Entitled to Vote

        Any creditor whose Claim is impaired under the Plan is entitled to vote if either (i) such holder's Claim is scheduled by Bayview Holdings (and such Claim is not scheduled as disputed, contingent or unliquidated), or (ii) such holder has timely filed a proof of claim which (a) currently is not the subject of an objection which has not been withdrawn, and (b) has not been disallowed by a Final Order. A vote of any creditor may be disregarded if the Bankruptcy Court determines that such vote was not solicited or procured in good faith and in accordance with the Bankruptcy Code.

        A creditor who is not entitled to vote on the Plan may file a motion with the Bankruptcy Court for an order temporarily allowing its Claim for purposes of voting to accept or reject the Plan. Any such motion must be timely filed with the Bankruptcy Court (in accordance with the Bankruptcy Rules and the applicable rules of the Bankruptcy Court) so as to be heard and determined by the Bankruptcy Court on or before the confirmation hearing.

        IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT BAYVIEW HOLDINGS' COUNSEL:

                Bruce E. Arkema
                Kevin J. Funk
                DurretteBradshaw PLC
                1111 East Main Street, 16th Floor
                Richmond, Virginia  23219
                Telephone:  (804) 775-6900
                Facsimile:  (804) 775-6911

E.      Impairment Under the Plan

        1.      Definition of Impairment. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" under a plan of reorganization unless such plan (a) leaves unaltered the legal, equitable and contractual rights of each holder of a claim or interest in such class, or (b) provides, among other things, for the cure of existing defaults and reinstatement of the maturity of the claims or interests in such class.

        2.      Impaired Classes. Classes 1, 2 and 3 are impaired under the Plan. Holders of Allowed Claim in Class 1, 2 and 3 are entitled to vote to accept or reject the Plan.  Because the holders of the Interest in Class 4 is having its Interest cancelled and will receive no distribution under the Plan, they are not entitled to vote on the Plan and its Class is deemed to have rejected the Plan.

## XIV.  CONFIRMATION OF THE PLAN

        The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan (i) is accepted by all impaired classes of Claims entitled to vote or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to

such class, and as to the impaired Classes of Claims and Equity Interests that are deemed to reject the Plan, (ii) is feasible, and (iii) is in the "best interests" of the holders of Claims impaired under the Plan.

A.  <u>Acceptance of the Plan</u>

The Bankruptcy Code defines acceptance of a plan of reorganization by a class of creditors as acceptance by creditors holding two-thirds (2/3) in dollar amount and a majority in number of the claims in such class (other than any such creditor designated under section 1126(e) of the Bankruptcy Code), but for that purpose counts only those creditors that actually cast ballots. Holders of claims that fail to vote are not counted as either accepting or rejecting a plan.

B.  <u>No Unfair Discrimination/Fair and Equitable Test</u>

In the event that any impaired Class of Claims or Equity Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of Bayview Holdings if, as to each impaired Class of Claims or Equity Interests which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."

Under the Bankruptcy Code, "fair and equitable" has different meanings for secured and unsecured claims. With respect to a secured claim, "fair and equitable" means (i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal in value to the allowed amount of its claim with a present value as of the effective date of the plan at least equal in value to such creditor's interest in Bayview Holdings' interest in the property securing its claim, (ii) if property subject to the lien of the impaired secured creditor is sold free and clear of that lien, the lien attaches to the proceeds of the sale, and such lien proceeds are treated in accordance with clause (i) or (iii) of this paragraph, or (iii) if the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

With respect to an unsecured claim, "fair and equitable" means either (i) each impaired unsecured creditor receives or retains property of a value, as of the Effective Date of the Plan, equal to the amount of its allowed claim, or (ii) the holders of claims or interests that are junior to the claims or interests of the dissenting class will not receive or retain any property under the plan.

With respect to Equity Interests, "fair and equitable" means that each Equity Interest holder (a) will receive or retain property of a value, as of the Effective Date of the Plan, equal to the greatest of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such interest; or (b) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

Under the Plan, no holder in a Class of Claims or Equity Interests is to receive Cash or other property in excess of the full amount of its Allowed Claim or Allowed Equity Interest. As to any holders of Allowed Secured Claims, the Plan provides that each such holder will retain its liens to the extent of its Allowed Claim and will either retain its collateral or receive on the

Effective Date (or as soon thereafter as is practicable) cash or payment in kind equal in value to its Allowed Secured Claim. As to holders of unsecured Claims, no holder of an Equity Interest with rights junior to holders of unsecured Claims will receive any distributions or retain any property under the Plan.  Accordingly, Bayview Holdings believes that the Plan does not discriminate unfairly as to any impaired Class of Claims or Equity Interests and is fair and equitable with respect to each such Class.

C.      "Best Interests" Test

The Bankruptcy Code provides that the Plan will not be confirmed, regardless of whether or not anyone objects to Confirmation, unless the Bankruptcy Court finds that the Plan is in the "best interests" of all Classes of Claims and Equity Interests which are impaired. The "best interests" test will be satisfied by a finding of the Bankruptcy Court that either (i) all holders of impaired Claims or Equity Interests have accepted the Plan, or (ii) the Plan will provide such a holder that has not accepted the Plan with a recovery at least equal in value to the recovery such holder would receive if Bayview Holdings were liquidated under Chapter 7 of the Bankruptcy Code.

The starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the liquidation of Bayview Holdings' remaining assets in the context of a Chapter 7 liquidation. Such value must then be reduced by the costs of such liquidation, including costs incurred during the Chapter 11 Case and allowed under Chapter 7 of the Bankruptcy Code (such as trustee's fees and fees and expenses of professionals retained by a trustee).  The potential Chapter 7 liquidation distribution in respect of each Class must be further reduced by costs imposed by the delay caused by conversion to Chapter 7.  The net present value of a hypothetical Chapter 7 liquidation distribution in respect of an impaired Class is then compared to the recovery in respect of such Class provided for in the Plan.  Bayview Holdings' Chapter 7 Liquidation Analysis is set forth above. For the reasons set forth above, Bayview Holdings submits that each impaired Class will receive under the Plan a recovery at least equal in value to the recovery such Class would receive pursuant to a liquidation of Bayview Holdings under Chapter 7 of the Bankruptcy Code. Bayview Holdings further believes that holders of Allowed Unsecured Claims would receive no distribution if this Bankruptcy Case were converted to a case under Chapter 7 of the Bankruptcy Code.

D.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a Chapter 11 plan may be confirmed only if the Bankruptcy Court finds that such plan is feasible. A feasible plan is one which will not lead to a need for further reorganization or liquidation of Bayview Holdings. Since the Plan provides for the liquidation of Bayview Holdings, the Bankruptcy Court will find that the Plan is feasible if it determines that Bayview Holdings will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet its post-confirmation obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Case. Bayview Holdings believes that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code. See Section IV(G) above, which discusses feasibility.

E.     Confirmation

     1.     <u>Conditions to the Effective Date</u>. Under the Plan, the following conditions to the Effective Date must occur:

        a.     The Bankruptcy Court shall have entered an order confirming the Plan in form and substance satisfactory to Bayview Holdings; and

        b.     No stay of the Confirmation Order shall then be in effect.

     2.     <u>Confirmation Hearing</u>.  Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) provides that any party in interest may object to confirmation of a plan.

**BY ORDER OF THE BANKRUPTCY COURT DATED _____, THE CONFIRMATION HEARING HAS BEEN SCHEDULED FOR _____, AT _____ __.M. EASTERN DAYLIGHT TIME, IN THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF VIRGINIA, 2nd FLOOR, 210 CHURCH AVENUE, ROANOKE, VIRGINIA 24011.**

     The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjourned hearing. Any objection to confirmation must be made in writing, filed with the Bankruptcy Court and served upon the following parties, together with proof of service thereof, so as to be ACTUALLY RECEIVED on or before _____ at 5:00 p.m. eastern daylight time):

     Bruce E. Arkema
     Kevin J. Funk
     DurretteBradshaw PLC
     1111 East Main Street, 16th Floor
     Richmond, Virginia  23219
     Telephone:  (804) 775-6900
     Facsimile:  (804) 775-6911

     -and-

     OFFICE OF THE UNITED STATES TRUSTEE
     First Campbell Square Building
     210 First Street, Suite 505
     Roanoke, Virginia 24011

     Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

At the Confirmation Hearing, the Bankruptcy Court must determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied and, upon demonstration of such compliance, the Bankruptcy Court will enter the Confirmation Order.

## XV.  CONCLUSION

Bayview Holdings submits that the Plan complies in all respects with Chapter 11 of the Bankruptcy Code, and Bayview Holdings recommends to holders of claims who are entitled to vote on the Plan that they vote to accept the Plan.

BAYVIEW HOLDINGS, LLC

By:   /s/   Kevin J. Funk

Bruce E. Arkema (VSB No. 18625)
Kevin J. Funk (VSB No. 65465)
DurretteCrump PLC
Bank of America Center
1111 East Main Street, 16th Floor
Richmond, Virginia  23219
Main Line: (804) 775-6900
Facsimile:  (804) 775-6911

*Counsel for Bayview Holdings, LLC, Debtor and Debtor-in-Possession*

## <u>CERTIFICATE OF SERVICE</u>

   I certify that on the 3rd day of February, 2011, a true and accurate copy of the foregoing Disclosure Statement was served, via the Court's ECF system and/or via first-class mail, on all creditors, equity security holders and other interested parties and the U. S. Trustee.

        /s/ Kevin J. Funk_____